UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff,

    – against –

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

              Defendant.

Adv. Pro. No. 08-01789 (SMB)
SIPA LIQUIDATION
(Substantively Consolidated)

----------------------------------------------------------X

In re:

    BERNARD L. MADOFF,

              Debtor.

----------------------------------------------------------X

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

              Plaintiff,

    - against -

DEFENDANTS LISTED ON ECF NO. 14283,

              Defendants.

Adv. Pro. Nos.  10-04995
                    10-04818
                    10-04914
                    10-04826
                    10-04644
                    10-04541
                    10-04728
                    10-04905
                    10-04621

----------------------------------------------------------X

## MEMORANDUM DECISION GRANTING FEES AND EXPENSES PURSUANT TO FED. R. CIV. P. 37(a)(5)(B)

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

      David J. Sheehan, Esq.
      Maximillian S. Shifrin, Esq.
          Of Counsel

*Attorneys for Plaintiff*

CHAITMAN LLP
465 Park Avenue
New York, NY 10022

      Helen Davis Chaitman, Esq.
      Gregory M. Dexter, Esq.
        Of Counsel

*Attorneys for Defendants*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

On September 20, 2018, the parties sent a joint letter (the "Joint Submission") to Hon. Frank Maas (ret.), the Discovery Arbitrator before whom they agreed to submit their discovery dispute,[1] triggering a third motion by the Defendants (hereinafter, the "Third Motion to Compel") to compel the production of certain trading records. According to the Defendants, the Plaintiff, trustee ("Trustee") of Bernard L. Madoff Investment Securities LLC ("BLMIS"), hid these records because they would prove that BLMIS used customer funds to purchase securities and allocated those purchases (and the profits from subsequent sales) to customers.[2]  After Judge Maas denied the Third Motion to Compel[3] and this Court affirmed the *Order*, *see In re BLMIS*, 605 B.R. 617 (Bankr. S.D.N.Y. 2019) ("*Appellate Decision*"), the Trustee filed this motion seeking reimbursement of his attorneys' fees and the Discovery Arbitrator's fees under FED. R.

---

[1]      The circumstances surrounding the appointment of the Discovery Arbitrator and his selection to hear the discovery disputes between the parties are set forth in *In re BLMIS*, 605 B.R. 617, 621 & n. 9 (Bankr. S.D.N.Y. 2019).

[2]      A copy of the Joint Submission is annexed as Exhibit AE to the *Declaration of Helen Davis Chaitman in Opposition to the Trustee's Motion for Fees and Expenses Pursuant to Fed. R. Civ. P. 37(a)(5)(B)*, dated Jan. 13, 2020 ("*Chaitman Declaration*") (ECF Doc. # 19253).

[3]      A copy of the *Discovery Arbitrator's Order*, dated Dec. 24, 2018 ("*Order*"), is annexed as Exhibit I to the *Chaitman Declaration.*

Civ. P. 37(a)(5)(B) totaling $70,095.87[4] from the Defendants and their counsel, Helen

Davis Chaitman, Esq. (*Trustee's Memorandum of Law in Support of His Motion for*

*Fees and Expenses Pursuant to Fed. R. Civ. P. 37(a)(5)(B)*, dated Nov. 15, 2019

("*Motion*") (ECF Doc. # 19138).)[5]

Chaitman and her clients opposed the *Motion*. They asserted, among other

things, that (i) the Third Motion to Compel was not a motion under Rule 37(a) making

its fee award provisions inapplicable, (ii) the Third Motion to Compel was "substantially

justified," (iii) Rule 37(a)(5)(B) does not permit the Trustee to recover his fees and

expenses incurred in connection with the appeal from the *Order*, (iv) the Trustee

produced documents in response to the Third Motion to Compel, (v) the Trustee's fee

application is deficient and (vi) the attorneys' fees sought in the *Motion* are

"unreasonable." (*Defendants' Memorandum of Law in Opposition to the Trustee's*

*Motion for Attorneys' Fees and Expenses Pursuant to Fed. R. Civ. P. 37(a)(5)(B)*, dated

Jan 13, 2020 ("*Opposition*") (ECF Doc. # 19252).)

For the reasons that follow, the *Motion* is granted to the extent indicated.

## BACKGROUND

As discussed in detail below, Chaitman's entire approach to the ongoing dispute

for trading records that culminated in the Third Motion to Compel is based on the false

---

[4]    This amount reflects a (1) subtraction of $1,051.20 for 1.8 hours billed on March 26, 2019 (*see Trustee's Reply Memorandum of Law in Further Support of His Application for Fees and Expenses Pursuant to Fed. R. Civ. P. 37(a)(5)(B)*, dated Jan. 17, 2020 ("*Reply*") at 16 n. 8 (ECF Doc. # 19258)), and (2) a 10% reduction of the legal fees to reflect the discount typically given to the Securities Investor Protection Corporation ("SIPC"). (*See id.* at 17 n. 10.)

[5]    "ECF Doc. #" refers to the electronic docket in Case No. 08-01789. References to other dockets will include the case number.

narrative that the Trustee is a liar who hid the fact that BLMIS used the funds deposited with BLMIS by customers of the Investment Advisory ("IA") side of its business, sometimes referred to as "House 17," to purchase securities and allocated those purchases to the customers.  (Joint Submission at 2 ("The Trustee [represented] to every court before which he appeared – and to the customer body and the general public – that Madoff/BLMIS never purchased any securities for his investment advisory customers and that these customers' funds were never used to purchase securities.  We now know that these representations were totally false.  However, the Trustee has resisted for two years in producing the evidence of his dishonesty."); *id.* at 3 ("Sharing access to the BLMIS Database would finally allow Defendants to access Madoff's trading records, which the Trustee has deliberately concealed.  It is the obvious solution to the Trustee's deliberate concealment of material evidence and yet, after finally making this offer, the Trustee rescinded his promise and indicated that he would not give all defense counsel access to the BLMIS data base.").)

Chaitman continues to promote this version.  (*Chaitman Declaration* at ¶ 3 ("As demonstrated by the record established at the trial of the Nelsons' cases [*Picard v. Carol & Stanley Nelson*, Adv. Pro. Nos. 10-04377 and 10-04658] conducted on May 8 and 9, 2019, the Trustee's representations that Madoff never purchased securities with investment advisory customers' money has been demonstrably false from inception.").) Chaitman goes further and accuses Bruce Dubinsky, the Trustee's expert witness, of perjury on this point at the Nelson trial.  (*Id.* ("Indeed, after repeatedly testifying falsely on direct examination that Madoff never purchased securities with investment advisory customers' money, the Trustee's expert, Bruce Dubinsky, admitted on cross-

examination that Madoff did buy securities with investment advisory customers' money.") (citing pages 10-14 of ECF Adv. Pro. No. 10-04377 Doc. # 174).)  The latter references, however, are *not* to the trial transcript in the Nelson cases but to a non-existent range of pages in a brief Chairman filed that doesn't even discuss Dubinsky's testimony.  (*See Defendants' Supplemental Memorandum of Law in Opposition to Trustee's Motion in Limine Number 2, to Admit the Former Testimony of Frank DiPascali*, dated Sept. 5, 2019, at 10-12[6] (arguing that the former trial testimony of Frank DiPascali was not admissible under Rule 807 of the Federal Rules of Evidence) (ECF Adv. Pro. No. 10-04377 Doc. # 174).)

As shown below, Chaitman knew before she ever served any discovery in these cases that these statements were false.

## A.    Dubinsky Report

In August 2013, Bruce Dubinsky, the Trustee's expert, issued the *Expert Report of Bruce G. Dubinsky MST, CPA, CFE, CVA, CFF, MAFF*, dated Aug. 20, 2013 ("Dubinsky Report") which was publicly filed on November 25, 2015.  (ECF Doc. # 12137-1.)  There, Dubinsky opined, *inter alia*, that the BLMIS IA business had always operated as a Ponzi scheme.  In connection with his opinion, Dubinsky noted that the "Proprietary Trading Business," a supposedly legitimate part of BLMIS' business sometimes referred to as "House 5," engaged in trading operations "funded from money taken from IA Business customer money."  (Dubinsky Report ¶ 29.)  His report included

---

[6]    Although Chaitman cited a page range ending in page 14, the document ended at page 12.

numerous additional statements attesting to the use of IA customer money to fund the

trading operations carried on by the Proprietary Trading Business:

- "[T]he Proprietary Trading Business was wholly dependent on enormous cash infusions of money derived from the IA Business." (*Id.*, ¶ 30.)

- "The Proprietary Trading Business's reported revenues included fraudulent cash infusions directly from the IA Business, as well as from the IA Business via MSIL." (*Id.*, ¶ 45.)[7]

- "[A] significant percentage of the Proprietary Trading Business revenue . . . was derived from IA Business Customer Money being transferred to the Proprietary Trading Business." (*Id.*, ¶ 278.)

- "Despite its audited financial statements and its public filings that gave the appearance of being a profitable firm, the Proprietary Trading Business relied on fraudulent infusions of cash originating from the IA Business." (*Id.*, ¶ 290.)

- "As previously detailed, the Proprietary Trading Business was improperly subsidized and propped up by numerous cash infusions of IA Business Customer Money from the IA Business." (*Id.*, ¶ 293.)

- "Despite the lengthy list of entries on the Proprietary Trading Business Trading Position Report. . . , none of these purported transactions actually occurred; they were fabricated and were derived from cash infusions from the IA Business." (*Id.*, ¶ 295.)

- "The initial method of moving cash from the IA Business to the Proprietary Trading Business was through the direct transfer of funds from the 703 Account and/or through the use of various brokerage accounts that were funded by IA Business customer money." (*Id.*, ¶ 313.)

- "[T]he Proprietary Trading Business received hundreds of millions of dollars in cash infusions from the IA Business.  In reality, they were nothing more than a one-way movement of cash using IA Business customer money." (*Id.*, ¶ 330.)

- "The cash infusions from the IA Business. . . allowed the Proprietary Trading Business to stay afloat and appear to generate profits. The reality is that the Proprietary Trading Business was not profitable." (*Id.*, ¶ 331.)

- "Not only did the Proprietary Trading Business receive fraudulent cash infusions from the IA Business, but by the early 2000s, it was wholly dependent on these funds in order to make it appear that it was a sustainable and profitable enterprise.  In other words, these cash infusions came to be the dominant source of cash funding for the Proprietary Trading Business." (*Id.*, ¶ 345.)

---

[7]    Madoff Securities International Limited ("MSIL") was an affiliate that Madoff used to facilitate the transfer of funds out of the IA business.  (Dubinsky Report ¶ 17.)

- "As discussed *supra*, approximately $800 million of cash was transferred from the IA Business to the Proprietary Trading Business from 1999 through 2008." (*Id.*, ¶ 368.)

The use of IA customer money to fund Proprietary Trading Business trades was no secret, despite what Chaitman says, and even the most cursory reading of the Dubinsky Report would have disclosed the Trustee's position.

The same securities that House 5 was purchasing were appearing on customer statements. The issue Dubinsky next analyzed was whether the equity securities and Treasury bills ("T-Bills") purchased by the Proprietary Trading Business bore any relationship to the securities positions appearing on IA monthly customer statements. In other words, did BLMIS allocate the House 5 trades to the IA customers as their monthly customer statements arguably implied.

Dubinsky concluded that they did not. He first compared the volume of equity securities held by BLMIS (and confirmed by Depository Trust & Clearing Corporation ("DTC") records) on October 31 in years 2002 through 2008, years for which DTC records still existed. He then matched this volume to the aggregate volume of the same securities reported on the IA customers' statements on the same day. He found that the volume of equity securities supposedly held by the IA customer statements was exponentially greater than the volume that House 5 actually held. (Dubinsky Report ¶¶ 161-70.) Dubinsky performed a similar analysis for the T-Bills and came to the same conclusion. He matched the volume of House 5 T-Bill positions (c0nfirmed by DTC records) at year-end from 2002 to 2008 and compared them to the aggregate T-Bill positions reflected on the monthly customer statements on the same dates. He found that the House 5 T-Bill positions represented only a fraction of the T-Bills purportedly

held by the IA customers on the same day.  (Dubinsky Report ¶¶ 171-74.)  "Most importantly, for the period during which DTC records are available, there are no DTC records evidencing the trades the IA Business purportedly executed."  (*Id.*, ¶ 135.)

Thus, by late November 2015, everyone in the world knew or should have known the Trustee's position that BLMIS used IA customer funds to purchase securities for the Proprietary Trading Business but those purchases bore no relation to the same securities reported on the customer statements.  In other words, the customer statements were fictitious.  All of the records that Dubinsky relied on were contained in a virtual data room ("E-Data Room"), and anyone who sought to challenge Dubinsky's conclusion would have to perform the same analysis.

## B.      Chaitman's Prior Motions to Compel and the Creation of the Protocol

Notwithstanding Dubinsky's analysis and conclusions, Chaitman sought discovery on behalf of the Defendants to support her theory that BLMIS used IA customer funds to purchase securities (which was undisputed) and allocated House 5 securities to IA customers (which was disputed).  In March 2016, Chaitman served document demands and interrogatories in the *Wilenitz* case[8] seeking the trading volume of each BLMIS division (request no. 16) and the total trading volume of each security appearing on Wilenitz's IA customer statements held by BLMIS and whether BLMIS allocated a portion to Wilenitz (request no. 18).  The Trustee responded that Chaitman

---

[8]      *See Picard v. Tr. u/art Fourth o/w/o Israel Wilenitz*, Adv. Pro. No. 10-04995 (SMB) (Bankr. S.D.N.Y.).

could get the answers by comparing the DTC records in the E-Data Room with account-specific documents that were produced as part of initial disclosures.

After receiving letters from the parties relating to their discovery dispute, the Court held a conference in May 2016 in an effort to narrow the issues.  The Trustee reiterated the position that, if Chaitman contested Dubinsky's conclusion that the House 5 purchases were never allocated to the IA customers and their statements were entirely fictitious, she could do precisely what Dubinsky did: inspect the documents in the E-Data Room and perform her own analysis.  Chaitman then raised a concern that the Trustee could update the E-Data Room without her knowing it.  The Court replied:

> THE COURT:  . . .  [I]f the Trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the data room, and maybe you have a continuing duty to check the data room.

*Appellate Decision*, 605 B.R. at 621.

But nothing was actually resolved at the May 2016 conference.  Chaitman insisted that she wanted to make a formal motion to compel "[b]ecause it's important for the record to contain an order."  *Id.* at 620-21.  Thus, no order was issued.  At Chaitman's insistence, any order would have to await a formal motion.

In August 2016, Chaitman filed a formal motion to compel in *Wilenitz* ("First Motion to Compel") seeking discovery with respect to, *inter alia,* request nos. 16 and 18. The parties stipulated to adjudicate the First Motion to Compel before the Discovery Arbitrator.  At that time, Chaitman's particular focus was on pre-1992 trading records because, she believed, those records preceded the onset of the Ponzi scheme and reflected actual trades on behalf of IA customers.  By order dated January 4, 2017, the

Discovery Arbitrator denied request nos. 16 and 18 because the underlying records were available to Chaitman and the burden of undertaking the requested investigation would be extensive; however, "to the extent there [were] any additional relevant records of securities trading that have not been made available to Wilenitz through [E-Data Room], they must promptly be produced." *Id.* at 622.

In February 2017, Chaitman moved again before the Discovery Arbitrator to compel the Trustee to produce pre-1992 trading records ("Second Motion to Compel"). The issue was that the Trustee had inherited a vast quantity of BLMIS documents that had not been transferred to E-Data Room. In particular, the Trustee maintained a separate electronic database, the "BLMIS Database," that contained roughly 30 million documents. (*Discovery Arbitrator's Order*, dated Mar. 15, 2017 ("Protocol").)[9] In addition, the BLMIS records included some 5,000 reels of microfilm. Judge Maas acknowledged the Trustee's efforts, including restoring microfilm reels at a cost of $500,000.00 and providing searchable indices. (Protocol at 4-5.) Although the Trustee had committed to producing all "relevant, proportional, and non-objectionable records to the extent they are readily accessible and identifiable," the Trustee contended that Chaitman was insisting on the production of all records, wherever located, without regard to relevance or proportionality. (*Id.* at 5.)

Judge Maas attributed the ongoing dispute to the parties' failure to meet and confer in good faith. As a result, he denied the Second Motion to Compel without prejudice and instituted the Protocol to narrow the parties' dispute and resolve their

---

[9]    A copy of the Protocol is annexed as Exhibit D to the *Chaitman Declaration*.

differences.  He observed that Chaitman "now has indices of the documents and electronic files in the Trustee's possession.  These indices should enable Ms. Chaitman to formulate more focused requests for trading records." (*Id.* at 6.)  The clear import of this statement was that Chaitman was supposed to use the indices to identify a narrower set of records that might reflect pre-1992 trading activity and meet with the Trustee.  Under the Protocol, Chaitman was directed to "send the Trustee's counsel a letter specifically identifying the additional documents she seeks to have produced, and where she believes they may be found." (*Id.*)  The parties were then required to meet and confer, and Judge Maas admonished both sides that the discovery requests must be relevant and proportional to the needs of the cases.  (*Id.*)  If a dispute remained, the parties had to send him a joint letter detailing the dispute.  He would then resolve the dispute based on their submission or schedule a further conference.  (*Id.* at 6-7.)

## C.    The Microfilm Dispute

During the summer of 2017, numerous parties, many represented by Chaitman, were gearing up for the continuation of Madoff's deposition.  *See Appellate Decision*, 605 B.R. at 624 n. 11 (describing the two-part deposition of Madoff).  Chaitman filed a brief that extensively discussed the trading records dispute and accused the Trustee of violating two orders mandating production (*i.e.*, the statement from the May 2016 conference and the Discovery Arbitrator's January 2017 order) and deliberately concealing trading records.  She also stated that she had just learned about the existence of 4,700 microfilm reels.  By then, however, the production "orders" on which she was relying had been superseded by the Protocol and its direction requiring Chaitman, in the first instance, to use the various indices to narrow her request for trading records, meet

and confer with the Trustee and write a joint letter to the Discovery Arbitrator. She did not mention in the brief, however, that the Discovery Arbitrator had denied the Second Motion to Compel and established the Protocol in March 2017, after the January 2017 order she was invoking. Unaware of those proceedings, the Court told the Trustee at a June 29, 2017 hearing:

> THE COURT: There are two orders directing you to turn over the documents. You haven't told me that they're not relevant.

*Appellate Decision*, 605 B.R. at 624.

Nevertheless, at a subsequent hearing on July 26, 2017, the Court adopted the same approach as Judge Maas. I told Chaitman that I was not going to force the Trustee to turn over all 4,700 reels. I suggested that she pick a sample of twenty reels and show me that they were relevant to her discovery requests, that is, that they disclosed the existence of pre-1992 trading records that the Trustee had not made available. Chaitman eventually reviewed four reels, found nothing and concluded that a further review was not worth the time. *Appellate Decision*, 605 B.R. at 631.

## D.    The Joint Submission and the Third Motion to Compel

In April 2018, Chaitman wrote to the Court seeking to move for sanctions against the Trustee for failing to turn over trading records in the BLMIS Database despite the existence of two orders directing production. In response, the Trustee described his voluminous productions to Chaitman and disclosed the existence of the Protocol which Chaitman had ignored. *Id.* at 625. At the ensuing May 2018 conference, the Court began by stating that it was not previously aware that the Discovery Arbitrator had established the Protocol to deal with this discovery dispute. After being advised that she

would likely lose a sanctions motion and could be liable for fees and costs if she failed to follow the Protocol, Chaitman agreed to adhere to the Protocol. *Id.*

On September 20, 2018, the Trustee and Chaitman sent the Joint Submission to the Discovery Arbitrator. In Chaitman's portion of the Joint Submission, she primarily sought access to the entire BLMIS Database to search for trading records (*i.e.*, the Third Motion to Compel) and also asked for sanctions based on the Trustee's purported violation of two orders mandating production. Judge Maas held a conference with the parties on November 19, 2018. The following day, Chaitman expanded her demand and sought to compel the Trustee to produce third-party trading records located in a warehouse maintained by the Trustee in Queens, New York "on the entirely unsupported assertion that the Trustee had intentionally incorporated into the BLMIS Database only those items which would support his claim that BLMIS's investment advisory operation was a Ponzi scheme." (*Order* at 5.)

## E.    The *Order*

On December 24, 2018, the Discovery Arbitrator issued the *Order* denying Chaitman's Third Motion to Compel. He began by recounting the long and tortuous history of the dispute regarding the pre-1992 trading records and the Trustee's efforts to accommodate Chaitman's ever changing demands. (*Order* at 3-5.) In addition to the documents made available in the E-Data Room, the Trustee had produced 18,306 records from the BLMIS Database, 167 reels of microfilm that might contain additional trading records from 2002 or earlier and an additional 34 reels with pre-1992 labeling all at the cost of $500,000.00. He also produced a searchable copy of the Queens

warehouse index[10] and an index of the electronic media that the Trustee had obtained

from BLMIS.  The indices "should have enabled Ms. Chaitman to formulate more

focused requests for trading records," (*id.* at 4), and the Trustee produced all of the

documents responsive to an additional 147 search terms that he had identified based on

internal BLMIS reports reflecting trading activity.  The Trustee also ran search terms

supplied by Chaitman incorporating common financial institution names like Fidelity

and Morgan Stanley.  His search confirmed that the use of all twenty-two search terms

proposed by Chaitman would return largely irrelevant documents, including emails.

(*Id.* at 5.)

Alternatively, the Trustee agreed to run certain BLMIS account numbers against

the third-party materials produced to the Trustee in response to Federal Bankruptcy

Rule 2004.  After Chaitman complained that the Trustee had not also run those terms

against the BLMIS Database, the Trustee did so.  The Trustee indicated that the account

number searches requested by Chaitman yielded nearly 200,000 pages of material,

comprising 10,000 documents.  (*Id.*)  With each production, Chaitman asked for more,

culminating with a request for access to the entire BLMIS Database and, one day after

the hearing before the Discovery Arbitrator on November 19, 2018, she also demanded

access to all of the third-party records in the 13,000 boxes in the Queens warehouse.

The Discovery Arbitrator concluded that "the Trustee has repeatedly tried to

accommodate Ms. Chaitman's requests for BLMIS trading records," and Chaitman had

failed to suggest additional searches in the BLMIS Database that might yield relevant

---

[10]     The Queens warehouse contains 13,000 boxes of documents.

documents.  In addition, she had not explained why her request had "morphed . . . into a request that the Trustee wade through the 13,000 boxes of documents in the warehouse."  Importantly, the Discovery Arbitrator found that Chaitman's assertion that the Trustee was only making available documents that support his theory of the case was based on a "contorted view of the record."  (*Id.*)

The Discovery Arbitrator concluded that the Defendants' assertion that the Trustee had proceeded in bad faith was "utterly unsupported by the record."  (*Id.* at 6.) Chaitman had failed to suggest "additional search terms that the Defendants themselves could productively run against the BLMIS Database if the Defendants were given unrestricted access to it."  (*Id.* at 5.)  Chaitman had failed to suggest a reasonable method of searching for any additional pre-1992 hard copy or electronic third-party trading records that might exist.  (*Id.* at 6.)  Although the Trustee was exceptionally well-funded,

> the Defendants have yet to establish that there is a basis to believe that any of the securities transactions undertaken by BLMIS's legitimate House 5 operations were intended to benefit its investment advisory customers or that the Court should indulge in that assumption.  Moreover, even if that were proven, there [has] been no showing that the efforts that the Trustee already has undertaken in an effort to locate pre-1992 BLMIS trading records are inadequate.  Indeed, despite being given digitized copies of hundreds of reels of microfilm, the Defendants have yet to show that they contain anything which would support their thesis that Madoff conducted actual trades for their accounts prior to 1992.  Nor have they demonstrated that the warehouse is likely to contain any documents that would be of use to them in this regard.

(*Id.* (footnote omitted).)  Accordingly, "there is no basis for requiring the Trustee to supplement the extensive efforts that he has already undertaken by affording Ms. Chaitman unfettered access to the BLMIS Database or requiring him to rummage through all of the boxes in the warehouse in an attempt to find additional pre-1992

third-party trading records." (*Id.* at 6-7.)

**F.    The Appeal and the *Appellate Decision***

In January 2019, Chaitman wrote to the Court seeking leave to appeal from the *Order*. On February 15, 2019, the Court entered an order granting Chaitman leave to appeal over the Trustee's objection. The main focus of the appeal concerned the May 2016 "order" issued by me from the bench during the discovery conference described above. Chaitman read it as an absolute directive that the Discovery Arbitrator had ignored.

As already noted above and discussed in the *Appellate Decision*, the May 2016 "order" was not an order, and Chaitman insisted at that conference on making a formal motion to obtain an order. *Appellate Decision*, 605 B.R. at 628. Moreover, at subsequent conferences and hearings before me, Chaitman had failed to disclose the denial of the Second Motion to Compel and the Protocol that she had not followed. After considering all of the issues raised by the Defendants, including the important issue of proportionality which Chaitman had ignored, the Court agreed with Judge Maas that "the Trustee should not have to bear the cost associated with the Defendants' everchanging and ever growing discovery requests to review 30 million electronic documents in the BLMIS Database or 13,000 boxes of hard copy documents without some evidence to show that BLMIS made some trades for the benefit of the IA customers before 1992." *Id.* at 631. At the conclusion of the opinion, the Court added that "[t]he Trustee may seek his expenses and attorneys' fees in accordance with Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure by separate application." *Id.*

G.    **The *Motion***

On November 15, 2019, the Trustee filed the *Motion* seeking reimbursement of certain fees and expenses incurred in his successful defense of the Third Motion to Compel, including the appeal to this Court.  The Trustee limited his request to the reimbursement of the legal fees of Maximillian Shifrin – an associate at Baker & Hostetler LLP.  In addition, the *Motion* seeks reimbursement of fees totaling $10,363.50 paid to JAMS by the Trustee for the services of the Discovery Arbitrator between October and December 2018 relating to the Third Motion to Compel.  (*See Declaration of Maximillian S. Shifrin in Support of Trustee's Motion for Attorneys' Fees Pursuant to Fed. R. Civ. P. 37(a)(5)(B)*, dated Nov. 15, 2019 ("*Shifrin Declaration*"), Ex. F (copies of JAMS invoices) (ECF Doc. # 19139).)  Chaitman and her clients opposed the *Motion* (*see Opposition* and *Chaitman Declaration*) and their substantive arguments are discussed below.

## DISCUSSION

A.    **Standards Governing the *Motion***

Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure provides:

> If the motion [to compel discovery] is denied, the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees.  But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

The imposition of expenses is "mandatory unless one of the conditions for not making an award is found to exist, but these conditions are themselves broad enough that the court retains some discretion in the matter."  *Pegoraro v. Marrero*, No. 10 Civ.

00051(AJN)(KNF), 2012 WL 5964395, at *4 (S.D.N.Y. Nov. 28, 2012) (quoting 8B
CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND
PROCEDURE § 2288 (3d ed. 2010)), *adopted by*, No. 10 Civ. 00051(AJN), 2013 WL
1448769 (S.D.N.Y. Apr. 9, 2013).  The purpose behind the mandatory sanction is to
"deter abusive or otherwise unjustifiable resort to the judiciary in the discovery process"
and to "encourage judges to be more alert to abuses occurring in the discovery process."
7 HON. WAYNE D. BRAZIL, MOORE'S FEDERAL PRACTICE § 37.23[1] (3d ed. 2019)
("MOORE'S").  The burden of persuasion lies with the party that lost the motion to
compel.  *Pegoraro*, 2012 WL 5964395, at *4.

An unsuccessful motion is "substantially justified" if there is a "genuine dispute"
or "if reasonable people could differ" as to the appropriateness of the motion.  *Pierce v.
Underwood*, 487 U.S. 552, 565 (1988) (citations omitted); *see also id.* ("justified to a
degree that could satisfy a reasonable person," which is the same as "reasonable basis in
both law and fact"); *accord Pegoraro*, 2012 WL 5964395, at *4 (same).  Although this is
an objective standard, "the meaning of *substantial justification* eludes crisp
articulation." MOORE'S § 37.23[2] (emphasis in original).  Consequently, judges have
"substantial discretion in applying it" and should "attend to all the pertinent
circumstances in the case at hand." *Id.*

As set forth in the Rule, expense-shifting sanctions can be imposed against the
party, the attorney, or both.  The Court may find that the party and the attorney are
"jointly and severally" liable for the sanction, *Kregler v. City of N.Y.*, No. 08 Civ.
6893(VM)(MHD), 2013 WL 1869169, at *2 (S.D.N.Y. Apr. 29, 2013), divide the sanction
equally between the attorney and the client, *Mugavero v. Arms Acres, Inc.*, 680 F. Supp.

2d 544, 575 (S.D.N.Y. 2010) ("Given that the relative culpability of Plaintiff and her counsel in perpetuating these discovery abuses is not clear, Plaintiff and Plaintiff's counsel will be held equally liable for the attorney's fees"), or apportion the sanction based on culpability. *See* MOORE'S § 37.23[4][a]. The party seeking reimbursement bears the burden of proof on the hours spent and the prevailing rates charged. MOORE'S § 37.23[8].

## B.    Application of Rule 37(a)(5)(B) to the Third Motion to Compel

The fee sanction provisions in Rule 37(a)(5) apply only to the types of motions set forth in Rule 37(a)(3). *See Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 381 (D.D.C. 2013) (fees under Rule 37(a)(5) cannot be awarded on a motion for sanctions made under Rule 37(b)), *appeal dismissed*, No. 13-7053, 2013 WL 4711721 (D.C. Cir. July 30, 2013). Pertinent to the *Motion*, Rule 37(a)(3)(B)(iv) provides:

> A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if . . . a party fails to produce documents or fails to respond that inspection will be permitted – or fails to permit inspection – as requested under Rule 34.

FED. R. CIV. P. 37(a)(3)(B)(iv). Chaitman argues that Rule 37(a)(5) is inapplicable because she sought sanctions under Rule 37(b) rather than relief under Rule 37(a) through the Third Motion to Compel. Unlike Rule 37(a), Rule 37(b) does not provide for an award of costs and attorneys' fees to the party that successfully opposes a sanctions motion under that subparagraph.[11]

---

[11]    Rule 37(b) states in pertinent part:

(2) *Sanctions Sought in the District Where the Action Is Pending.*

(A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey

Her argument mischaracterizes the record.  First, while it is true that she never

mentioned Rule 37(a) and invoked Rule 37(b) at one point in her portion of the Joint

Submission, (Joint Submission at 4), the only "sanction" she sought aside from her costs

and expenses was an order compelling the Trustee to share access to the BLMIS

Database and to produce the trading records.  (Joint Submission at 3 ("We ask Your

Honor to order the Trustee to give the Defendants complete access to the BLMIS

Database.").)  She did not seek any of the relief specified in Rule 37(b) such as

preclusion, striking pleadings or deeming certain facts to be established.  Second, the

Trustee read her motion as a motion to compel and defended it as such.  (Joint

Submission at 4 ("Ms. Chaitman requests an order compelling the wholesale production

of approximately 30 million documents—a collection comprising every hard-copy and

---

an order to provide or permit discovery . . . the court where the action is pending may
issue further just orders.  They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as
established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or
defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit
to a physical or mental examination.

. . . .

(C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must
order the disobedient party, the attorney advising that party, or both to pay the
reasonable expenses, including attorney's fees, caused by the failure, unless the failure
was substantially justified or other circumstances make an award of expenses unjust.

electronic document recovered from the operative floors of BLMIS headquarters at the Lipstick Building. Ms. Chaitman makes this application without any regard to relevance and proportionality considerations. . . .").) Chaitman never disabused him of his understanding. Third, the Discovery Arbitrator viewed the motion as a motion to compel. (*Order* at 2 ("For the reasons set forth below, the Defendants' application to compel this discovery is denied.").) Fourth, when Chaitman appealed from the *Order* to this Court, she characterized her motion as a motion to compel. (*Defendants-Appellants' Memorandum of Law in Support of Their Appeal of Judge Maas' January 2, 2019 Order Denying Defendants' Motion to Compel the Trustee to Produce the Trading Records*, dated Mar. 18, 2019 ("*Appellants' Brief*"), at 1 ("The January 2, 2019 Order denied Defendants' most recent motion to compel the production of third-party trading records evidencing the trading activities of Madoff and BLMIS.") (ECF Doc. # 18578-1).)

Accordingly, the Third Motion to Compel brought on by the Joint Submission was a motion to compel under Rule 37(a)(3)(B)(iv), the Trustee successfully opposed the motion and is entitled to his reasonable attorneys' fees and expenses unless Chaitman and the Defendants show that "the motion was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(B).

### 1.    Substantial Justification

Chaitman claims that the Third Motion to Compel was substantially justified because two separate orders directed the Trustee to produce trading records, there was no other way to obtain the records from another party and she reasonably believed that the Trustee would make them available. (*Opposition* at 13-15.) As discussed, the May

2016 "order" was plainly not an order because Chaitman insisted on making a formal motion to obtain an order compelling production.  Furthermore, although Judge Maas did issue an order in January 2017 that directed the Trustee to add additional trading records not already produced to the E-Data Room, he effectively modified this direction immediately thereafter when he denied the Second Motion to Compel, which had sought the production of the same records he supposedly ordered produced, and instituted the Protocol.  The Protocol put the onus on Chaitman.  She was required to use the indices prepared by the Trustee to narrow her request.  Instead, she sought in the Joint Submission to compel the production of all trading records in the BLMIS Database, and one day after the conference before Judge Maas, she further insisted on the production of all trading records in the 13,000 boxes of records located in the Queens warehouse.

Most disturbing, however, were her misstatements of fact to justify forcing the Trustee to undertake an onerous search without regard to any notion of proportionality. She repeatedly charged that he had hidden the fact that BLMIS used IA customer funds to purchase securities.  However, Dubinsky disclosed in his report, publicly filed in November 2015, that the Proprietary Trading Business used IA customer funds to trade, but these purchases bore no relationship to the positions reported in the monthly customer statements.  He reached the same conclusion with respect to the option trades disclosed in the IA customer statements.  (Dubinsky Report ¶¶ 185-89.)[12]

---

[12]    Chaitman also seemed to suggest that the Trustee duped the Second Circuit into approving his "unique definition of 'net equity,'" and as a result, "many customer claims were disallowed entirely because the customers were cruelly deemed to be 'net winners.'"  (Joint Submission at 1-2.)

Accordingly, the Court concludes that the Third Motion to Compel was not substantially justified. It ignored the chronology of the record relating to the production of trading records that ultimately placed the onus on Chaitman to use the indices to make narrower requests. Instead, the Third Motion to Compel continued to ask for the production of the entire BLMIS Database and subsequently, the production of the 13,000 boxes in the Queens warehouse as well.[13] Furthermore, to justify placing the burden on the Trustee, she falsely accused him of deliberately concealing the use of IA customer funds to purchase securities when she knew, had she read it, that the Dubinsky Report disclosed that precise fact.

### 2. Partially Prevailing

Subject to certain exceptions, Rule 37(a)(5)(A)[14] shifts the costs of the motion to compel to the party opposing disclosure if the movant prevails or the opposing party

---

[13]     In fact, even after the Protocol was issued, the Defendants served a third request for production that again asked for all trading records without any attempt to narrow the request. (*See Chaitman Declaration*, Ex. S (*Defendants' Third Set of Requests for Production of Documents to the Trustee*, dated Nov. 21, 2017 (Request No. 1: "All records evidencing securities trades placed by or on behalf of Bernard L. Madoff or Bernard L. Madoff Investment Securities, LLC ('BLMIS'), or on behalf of customers of Bernard L. Madoff or BLMIS, with or by third parties, regardless of whether the records evidence 'House 5' or House 17' trading. These records would include, for example, transaction confirmation slips or monthly or quarterly statements from JPMorgan Chase, Bear Sterns, Fidelity, and any other third-party financial institutions.").)

[14]     Rule 37(a)(5)(A) provides:

> If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
>
>> (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
>>
>> (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

produces the requested disclosure after the motion is filed.  Chaitman argues that the

Defendants "partially prevailed" on the Third Motion to Compel because the Trustee

produced records from the Queens warehouse while the appeal from the *Order* was

pending.  (*Chaitman Declaration* at ¶ 57; *see Opposition* at 12-13.)  After receiving

access to the Queens warehouse in May 2019, Chaitman made a search and asked the

Trustee to produce 138 boxes of records.[15]  (*Chaitman Declaration* at ¶ 57.)  She

contends that her search revealed trading records that had never been produced.  (*Id.* at

¶ 59.)  In response, the Trustee contends that Chaitman used the indices *after* losing the

Third Motion to Compel to select boxes for review.  (*Reply* at 3 n. 1.)  Of the 138 boxes

she selected, 125 had already been scanned and were in the E-Data Room and/or had

already been produced to Chaitman, and the Trustee scanned and produced eleven of

the thirteen remaining boxes.[16]  (*Motion* at 3.)  Moreover, the Warehouse index given to

Chaitman indicated (in the fourth column) whether the contents of the box had already

been scanned.  (*See Chaitman Declaration*, Ex. B.)

Rule 37(a)(5)(A) does not allow for defraying the fees sought by the Trustee.  The

provision that authorizes the award of fees and expenses to the movant "if the disclosure

or requested discovery is provided after the motion was filed" was added to the Rule in

1993.  According to the advisory committee note, the revision was intended to deal with

the situation "where information that should have been produced without a motion to

---

(iii) other circumstances make an award of expenses unjust.

[15]    Chaitman contends that the warehouse index was "of little, if any, use in locating" trading records. (*Chaitman Declaration* at ¶ 57.)  According to the Trustee, Chaitman sent the index to his attorneys identifying the boxes she wanted to review.  (*Reply* at 3 n. 1; 9 n. 4.)

[16]    The remaining two boxes contained personal items or microfiche which the Trustee objected to scanning based on the cost.  (*Motion* at 3.)

compel is produced after the motion is filed *but before it is brought on for hearing.*"
FED. R. CIV. P. 37(a)(4)(A) advisory committee's note to 1993 amendment (emphasis added).  Chaitman undertook her search and the Trustee produced 136 of the 138 boxes she identified after she had lost the Third Motion to Compel before Judge Maas. Moreover, she did not attempt in good faith to obtain the disclosure without Court action because she insisted on full access to the entire BLMIS Database (and subsequently, the entire Queens warehouse) and did not use the indices until after Judge Maas denied the Third Motion to Compel.

### 3.    Failure to Certify

Chaitman argues that sanctions are improper because the Trustee never certified that he had conferred in good faith with Chaitman.  She reasons that the Joint Submission included two motions:  the Defendants' Third Motion to Compel and the Trustee's motion for a protective order.  Because the Trustee did not certify that he had conferred with Chaitman in good faith as required by Rule 37(a)(1), the Rule 37(a) fee-shifting provisions, which apply to a motion for a protective order, preclude an award of fees and expenses.  (*Opposition* at 15-16.)

The short answer is that the Joint Submission did not request a protective order. For the reasons stated, it sought an order compelling discovery.

### C.    The Application of Rule 37(a)(5)(B) to the Appeal

The parties disagree on whether the fee-shifting provisions apply to the attorneys' fees incurred by the Trustee in opposing the motion for leave to appeal and the appeal itself.  These two items account for $47,596 (before the 10% SIPC discount, discussed

*infra*) of the fees sought. (*Shifrin Declaration*, Exs. D, E.) Rule 37(a)(5)(B) authorizes

an award of the reasonable fees and expenses incurred in "opposing the motion." The

question is whether this also includes costs of opposing the appeal from the *Order*.[17]

Two circuits reached different results on related questions. In *Rickels v. City of

South Bend, Ind.*, 33 F.3d 785 (7th Cir. 1994), Rickels, acting *pro se*, served discovery

requests on his former counsel (Evans), Evans successfully moved for a protective order

and the district court awarded Evans $1,386.78 under Rule 37(a)(4) (now Rule 37(a)(5))

for the expenses incurred in making the motion. *Id.* at 786. Rickels appealed and Evans

sought sanctions under Rule 11 arguing that the appeal was frivolous. *Id.* at 787.

After concluding that sanctions for frivolous appeals was governed by the Rule 38

of the Federal Rules of Appellate Procedure rather than Federal Civil Rule 11, *id.*, Judge

Easterbrook considered whether Evans could recover her appellate costs and fees under

the fee shifting provisions of Rule 37(a)(4). After (i) observing that "[t]he great

operative principle of Rule 37(a)(4) is that the loser pays," *id.* at 786 (quoting 8 CHARLES

ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2288 at 787

(1970)), and (ii) construing *Comm'r of INS v. Jean,* 496 U.S. 154 (1990) ("*INS v. Jean*"),

which dealt with the fee shifting provisions of the Equal Access to Justice Act, he ruled

that Rule 37(a) covered Evans' costs and fees on appeal:

> The rationale of fee-*shifting* rules is that the victor should be made
> whole—should be as well off as if the opponent had respected his legal
> rights in the first place. This cannot be accomplished if the victor must
> pay for the appeal out of his own pocket. . . .
>
> That Rule 37(a)(4) "applies" only in the district courts does not establish

---

[17]    The Court invited and received supplemental briefing on this issue from the parties.

that its reference to "reasonable expenses incurred in opposing the motion, including attorney's fees," includes only the expenses incurred *prior to* the ruling on the motion.  A sore loser who files repeated motions under Rules 59 and 60 in an effort to obtain relief from the award should expect to pay the tab, even though the opponent's expenses of opposing these requests may be distinguished from the expenses of opposing the discovery motion and obtaining the protective order.

If instead of pestering the victor with motions in the district court, the loser files equivalent documents in the court of appeals, the upshot should be the same. . . .  Evans is entitled to the reasonable expenses, including attorneys' fees, incurred in obtaining the protective order and defending her entitlement to this reimbursement.  Nothing less will make her whole; anything less would defeat the function of Rule 37(a)(4).

*Rickels*, 33 F.3d at 787-88 (emphasis in original).  Several courts have followed *Rickels'* rationale and awarded fees and expenses beyond those directly incurred in successfully prosecuting or opposing a motion to compel in the trial court.  *See Chesemore v. All. Holdings, Inc.,* No. 09–cv–413–wmc, 2015 WL 5093283, at *2 (W.D. Wis. Aug. 28, 2015) (awarding the fees and expenses of preparing the petition for fees under Rule 37(a)(5)(A))*; Enterasys Networks, Inc. v. DNPG, LLC,* Civil No. 04–CV–209–PB, 2006 WL 1644598, at *2-3 (D.N.H. June 12, 2006) (citing *Rickels* and awarding fees in connection with the appeal of the Magistrate Judge's order compelling discovery to the district court and the fees incurred in consulting with an expert in connection with a motion to compel); *Mudron* v. *Brown & Brown, Inc.*, No. 03 C 8708, 2005 WL 645927, at *3 (N.D. Ill.  Mar. 17. 2005) (awarding fees and expenses under Rule 37(a)(4) incurred in connection with a motion for reconsideration, a motion for a writ of *mandamus* in the Seventh Circuit and a motion for a protective order, all related to the order compelling production); *Maese v. Lamey* (*In re Lamey*), Adv. No. 15–1030 t, 2015 WL 6666244, at *7 (Bankr. D.N.M. Oct. 30, 2015) (concluding that fees incurred in drafting the attorney fee affidavit came within the "making the motion" language of Rule 37(a)(5)(A)).

One year after the *Rickels* Court ruled, the Ninth Circuit reached the opposite conclusion on analogous facts in *Telluride Mgmt. Sols., Inc. v. Telluride Inv. Grp.*, 55 F.3d 463 (9th Cir. 1995), *abrogated on other grounds by Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198 (1999). There, the Magistrate Judge had ordered a principal of the defendants (Beadle) to appear for a deposition. Prior to the deposition, the district court dismissed the complaint on the basis of lack of subject matter jurisdiction. The plaintiff nevertheless insisted on taking Beadle's deposition, but Beadle failed to appear. The plaintiff successfully moved to compel the deposition and for sanctions (it had filed an amended complaint in the interim) against the defendants and their attorneys (Steel). The Magistrate Judge granted sanctions and also granted the plaintiff's motion for additional sanctions incurred in opposing the reconsideration of the sanctions award, and the district court affirmed. *Id.* at 465.

On appeal to the Ninth Circuit, Steel argued that the award relating to the costs of the motion for reconsideration was error. All of the judges agreed. Citing an earlier decision, *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,* 982 F.2d 363 (9th Cir. 1992), and reading Rule 37(a)'s fee-shifting provisions narrowly, the circuit court concluded that although Rule 37(a)(4) provided for fees and expenses incurred in making a motion to compel, the Rule does not provide an award based on costs incurred in defending a motion for reconsideration. *Telluride*, 55 F.3d at 467.[18] Several courts have also read the fee-shifting provisions narrowly to exclude any fees or expenses not incurred in directly opposing the motion in the trial court. *E.g., Stead v. Unified Sch.*

---

[18] The *Telluride* Court did not cite or discuss *Rickels.*

*Dist. #259 Wichita Pub. Sch.*, No. 13-1378-DDC, 2014 WL 3854231, at *4 (D. Kan. Aug.

6, 2014) (citing *Telluride* and concluding that the fees and costs incurred by the

defendants for responding to the plaintiff's motion for reconsideration of an order

compelling discovery were not authorized by Rule 37); *Haley v. Merial, Ltd.*, No.

4:09CV00094–WAP–DAS, 2011 WL 6189511, at *1 (N.D. Miss. Dec. 13, 2011) (Rule

37(a) does not permit an award of fees and expenses incurred in defending the

unsuccessful objection to the Magistrate Judge's order compelling discovery).

In addition to the foregoing authorities, the Defendants cite the Supreme Court's

decision in *Baker Botts L.L.P. v. Asarco LLC*, 135 S. Ct. 2158 (2015) as precluding the

award of fees and expenses in connection with the appeal from the *Order*.  There, Baker

Botts, a law firm that had been retained by the debtor in possession pursuant to 11

U.S.C. § 327(a), filed a fee application pursuant to 11 U.S.C. § 330.  The debtor, now

controlled by a different entity, objected to the application.  The bankruptcy court

conducted a six-day trial, overruled the objection and awarded Baker Botts, among

other things, over $5 million for the time spent defending its fee application.  *Id.* at

2163.

The issue before the Supreme Court was whether the bankruptcy court was

authorized to award compensation for the time spent defending the fee application.  The

Supreme Court said no.  Beginning with a reaffirmation of the American Rule that

"[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract

provides otherwise," *id.* at 2164 (quoting *Hardt v. Reliance Standard Life Ins. Co.,* 560

U.S. 242, 252-53 (2010)), the Court ruled that it would "not deviate from the American

Rule absent explicit statutory authority," *id.* (internal quotation marks and citation

omitted), and recognized departures from the American Rule "only in 'specific and explicit provisions for the allowance of attorneys' fees under selected statutes.'" *Id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 260 (1975)).

The Court concluded that 11 U.S.C. § 330(a) did not authorize compensation for fee-defense litigation. Section 330(a) authorized "reasonable compensation for actual, necessary services rendered" but did not explicitly or specifically authorize courts "to shift the costs of adversarial litigation from one side to the other—in this case, from the attorneys seeking fees to the administrator of the estate—as most statutes that displace the American Rule do." *Id.* at 2165. Furthermore, "services rendered" ordinarily refers to services performed for another, not oneself. *Id.* "Time spent litigating a fee application against the administrator of a bankruptcy estate cannot be fairly described as 'labor performed for'—let alone 'disinterested service to'—that administrator." *Id.* In addition, other provisions of the Bankruptcy Code expressly shift the costs of litigation to the adversary. *Id.* at 2165-66 (citing 11 U.S.C. § 110(i)). Had Congress intended to shift the costs of fee-defense litigation, it could have done so in a similar manner. *Id.* at 2166. Finally, the Court distinguished *INS v. Jean*, the decision on which Judge Easterbrook relied in *Rickels*, explaining that the case dealt with the broader fee-shifting provisions of the Equal Access to Justice Act that everyone agreed authorized court-awarded fees for fee-defense litigation. *Id.* at 2167-68.

Assuming the rules governing the interpretation of fee-shifting provisions in statutes apply to fee-shifting provisions under the Federal Rules of Civil Procedure, I conclude that the shifting of the fees and costs relating to the appeal is authorized under the facts of this case. The *Order* was reviewed under an abuse of discretion standard.

*Appellate Decision*, 605 B.R. at 627.  The standard is highly deferential, and a court ordinarily abuses its discretion when its decision "rests on an error of law or a clearly erroneous finding of fact, or if the decision cannot be located within the range of permissible outcomes." *Id.* (internal quotation marks and citation omitted).

Here, the review was more exacting.  Under the order that appointed Judge Maas to serve as the Discovery Arbitrator, his findings of fact as well as his conclusions of law were subject to *de novo* review.  *Id.*  The Defendants primarily argued that I ordered the production of all trading records at the May 2016 conference.  As a result, Judge Mass could not make an inconsistent order that relieved the Trustee of that burden.  *Id.* ("Defendants' principal contention is that I ordered the Trustee to produce all of the trading records by putting them in the E-Data Room, the Trustee did not, the Discovery Arbitrator ignored the Court's order and the [*Order*] must be reversed on this basis alone.") (record citation, internal quotation marks and alteration omitted).  I reviewed the circumstances surrounding the May 2016 "order" *de novo* and concluded that the factual underpinning of the Defendants' principal argument was wrong; I did not issue an order in May 2016.  *Id.* at 628.

I also addressed the proportionality of the request for all trading records *de novo*. I reviewed the findings of the Dubinsky Report and its conclusion that the House 5 purchases were not allocated to the IA customers.  I further considered the volume of records possessed by the Trustee, the enormous quantity of records he had already produced and his efforts to meet the Defendants' ever-increasing demands.  I concluded that his efforts had been adequate, and he should not have to incur a substantial expense based on the Defendants' speculative hope that they might find a nugget of gold

buried in a mountain of documents:

> [D]espite all of these efforts, the Defendants have failed to substantiate a claim that there are trading records that will support their theories or that the Trustee has proceeded in bad faith.  Instead, they want the Trustee to rummage through a BLMIS Database of 30 million documents and another 13,000 boxes of documents in the hope that he can cull out documents that will support their theory.  The Trustee has already expended $500,000 just restoring 201 reels of microfilm (there are over 5000) and the cost to the estate to digitize or produce all of the BLMIS records alone, without regard to the cost of searching them, would be monumental.

*Id.* at 630-31.

In substance, the appeal was a continuation of the Third Motion to Compel.  The Defendants got a "do over" and lost again.  The Court conducted a *de novo* review of the facts and law that informed Judge Maas' discretion, concluded that he had not abused his discretion and affirmed the *Order*.  Under the circumstances, the Trustee's opposition on appeal was opposition to the Third Motion to Compel within the meaning of Rule 37(a)(5)(B) and he is entitled to the reasonable costs and attorneys' fees he incurred opposing the appeal.[19]  He is not, however, entitled to the $7,416.80 in fees that he incurred opposing the Defendants' motion for leave to appeal because the Defendants prevailed on that motion.

## D.    The Trustee's Attorneys' Fees and Expenses

The Trustee's initial request for fees, excluding those incurred in opposing the

---

[19]    The Defendants make the threshold argument that the Trustee is not entitled to his costs and fees on appeal because I granted leave to appeal.  (*Opposition* at 2, 10.)  They cite *Mantell v. Chassman*, 512 F. App'x 21 (2d Cir. 2013) for support but the decision is distinguishable.  There, the district court *invited* Mantell to file an objection to the defendant's application for an award of fees and expenses under Rule 37(a)(5)(A), and then sanctioned Mantell for doing so by awarding the fees incurred responding to the objection to the defendant.  *Id.* at 24.  Here, the Court did not invite the Defendants to appeal from the *Order*.  The Defendants sought leave to appeal and I granted their request over the Trustee's opposition.

motion for leave to appeal, broke down as follows:

| Category | Amount ($) |
|---|---|
| Joint Letter to Judge Maas | 7,866.00 |
| Arbitration before Judge Maas | 6,555.00 |
| Opposition to Supplemental Request Post-Arbitration | 6,555.00 |
| Appeal of the *Order* | 40,179.20 |
| | **61,155.20** |

(*Shifrin Declaration*, Exs. A, B, C, E.)  The Trustee also seeks reimbursement of the

expenses aggregating $10,363.50 paid to JAMS, Judge Maas' employer, in connection

with his services relating to the Third Motion to Compel.  (*Id.*, Ex. F.)  As noted, these

sums do not reflect the 10% reduction that the Trustee gives to SIPC which is paying his

bills.  That reduction will be applied at the end.

### 1.    Attorneys' Fees

### a.    Introduction

In determining an appropriate fee award, courts generally apply the "lodestar"

method under which they arrive at a fee "by multiplying 'the number of hours

reasonably expended on the litigation . . . by a reasonable hourly rate.'"  *Kirsch v. Fleet

St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998) (quoting *Hensley v. Eckerhart*, 461 U.S. 424,

433 (1983)).  The lodestar should be based on the prevailing market rates for attorneys

with comparable skill and standing in the pertinent legal community.  *Kerin v. U.S.

Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000).  "Hours that are excessive, redundant, or

otherwise unnecessary, are to be excluded . . . and in dealing with such surplusage, the

court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Kirsch*, 148 F.3d at 173 (citations and internal quotation marks omitted).

"Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Id*.[20] The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed, and where the documentation of hours is inadequate, the Court may reduce the award accordingly. *Hensley*, 461 U.S. at 433. Similarly, vague and ambiguous descriptions of work done prevent the court from assessing the reasonableness of the work and should be eliminated or reduced. *Cosgrove v. Sears, Roebuck & Co.*, No. 81 CIV. 3482 (AGS), 1996 WL 99390, at * 3 (S.D.N.Y. Mar. 7, 1996) ("[M]any of the descriptions of the work performed are vague, including entries such as 'review of file,' 'review of documents' and 'review of [adversary's] letter.' There can be no meaningful review of time records where the entries are too vague to determine whether the hours were reasonably expended."); *accord Dotson v. City of Syracuse*, No. 5:04-CV-1388 (NAM/GJD), 2011 WL 817499, at *24 (N.D.N.Y. Mar. 2, 2011) ("Descriptions of work such as 'review of file', 'review of documents' and 'review of letters' are vague and do not permit a court to

---

[20]    The Defendants suggested that Shifrin did not maintain contemporaneous time records. While not exactly on point, Shifrin confirmed in the *Shifrin Declaration* that he performed the work reflected in the time records summarized in the exhibits. Furthermore, SIPC is funding this case, reviews all of the applications for compensation and makes recommendations to the Court regarding the fee to be awarded to each applicant including Baker & Hostetler LLP. (*See, e.g., Recommendation of the Securities Investor Protection Corporation in Support of Twenty-Ninth Application of Trustee and Counsel for Interim Compensation and Reimbursement of Expenses*, dated Mar. 29, 2019, at ¶ 2 ("SIPC, by its staff, has carefully evaluated the Application. This has included analyzing the detailed reports of time spent and services rendered as set forth in the Application and the exhibits thereto. . . .") (ECF Doc. # 18619).) SIPC could not conduct this review without contemporaneous time records.

evaluate the reasonableness of the services."), *aff'd*, 549 F. App'x 6 (2d Cir. 2013); *Schruefer v. Winthorpe Grant, Inc.*, No. 99 Civ. 9365 (GBD)(AJP), 2003 WL 21511157, at *3 (S.D.N.Y. July 2, 2003) (imposing overall reduction of 10% based on vague time entries including "various phone conferences," "review file," "legal research," and "case administration").

 "[C]ourts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application [and] have endorsed percentage cuts as a practical means of trimming fat from a fee application." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983). To address problems like block billing and vagueness, courts routinely apply across the board reductions. *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989) (affirming across the board reduction for vague time entries), *cert. denied*, 493 U.S. 1071 (1990); *Colon v. City of New York*, Nos. 09 CV 0008 (JBW), 2012 WL 691544, at *21 (E.D.N.Y. Feb. 9, 2012) (collecting cases), *adopted by*, Nos. 09–CV–8, 09–CV–9, 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012); *Reiter v. Metro. Transp. Auth. of the State of New York*, No. 01 Civ. 2762 (GWG), 2007 WL 2775144, at *15 (S.D.N.Y. Sept. 27, 2007) (collecting cases); *Klimbach v. Spherion Corp.*, 467 F. Supp. 2d 323, 332 (W.D.N.Y. 2006) (applying a 10% across the board reduction for vague billing entries); *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, No. 04 Civ. 3600(SWK), 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005) (reducing lodestar amount by 25% to account for instances of block billing, vagueness and excess).

The fee applicant bears the burden of proving the reasonableness and necessity of its services. *Alicea v. City of New York*, 272 F. Supp. 3d 603, 609 (S.D.N.Y. 2017); *Boutros v. JTC Painting & Decorating Corp.*, No. 12 Civ. 7576(PAE), 2014 WL 3925281, at *4 (S.D.N.Y. Aug. 8, 2014); *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 512 (S.D.N.Y. 2011). The Defendants' counsel conceded at oral argument that Shifrin's billing rate was reasonable when reduced by 10%. (Transcript of Hr'g, held Jan. 22, 2020, at 24:7-14 (ECF Doc. # 19275).) Accordingly, the only question is the reasonableness of the services.

### b.   Proceedings Before Judge Maas

### i.   Joint Submission

Shifrin expended 13.8 hours during an eighteen-day period (9/4/2018 through 9/21/2018) and billed $7,866. (*See Shifrin Declaration*, Ex. A.) Most of the time falls into one of two categories: reviewing Chaitman's proposed submission or drafting a response. On the whole, the amount of time was not unreasonable. As oft noted, the trading records dispute was long and tortuous, lasting almost three years. Indeed, the *Chaitman Declaration* submitted in opposition to the *Motion* required twenty-four pages and thirty-three exhibits to describe her version of the events. Furthermore, her version was often selective if not fanciful, and it took significant time and effort for the Trustee to review and correct the record. While the time records include large blocks of time, they describe what Shifrin did.

In addition, although most of the services were expended prior to the submission of the Joint Submission to Judge Maas, they were still rendered for the purpose of opposing the Third Motion to Compel. Unlike the typical case where one party makes a

motion to compel and the other party then files its opposition, the Protocol required the submission of a joint letter. The Defendants' portion constituted the Third Motion to Compel. The Trustee's portion was his opposition drafted after reviewing the Defendants' proposed portion, a fact borne out by Shifrin's time records. Thus, the Joint Submission was the end of the written opposition process for the Trustee, not the beginning.

The time records do contain some instances of block billing where the block also includes conferences with other attorneys in the firm, namely Nicholas Cremona and Seanna Brown. (*E.g.* 9/4, 9/5, 9/21.) I conclude that no reduction is required. First, these attorneys have been involved in these cases for several years and their collaboration with Shifrin facilitated the expeditious and efficient rendition of services. In fact, Cremona also participated in the arbitration. Second, the Trustee is not seeking to recover fees billed by these attorneys or any other attorneys in connection with the Third Motion to Compel.

Accordingly, the Trustee is awarded fees in the sum of $7,866.00 for his firm's services in connection with the preparation of the Joint Submission.

### ii.    The Arbitration

Shifrin billed 11.5 hours, totaling $6,555.00 preparing for and attending the discovery arbitration before Judge Maas on November 18 and 19, 2018. (*Shifrin Declaration*, Ex. B.) Shifrin billed 3.8 hours on November 18 preparing for the arbitration scheduled for the next day. Given the history, that time is reasonable, and I

can determine from the time records what he did.  Accordingly, an award for those services will be allowed.

Chaitman raised a question regarding the November 19 services.  Shifrin billed 2.5 hours for participating in the arbitration and conferring with Cremona.  (*See Chaitman Declaration*, Ex. B.)  The Trustee points out that Cremona, a partner in the firm, also attended the arbitration, (*Reply* at 14), which explains the conferences, and the Trustee is not seeking the fees Cremona billed although he might be entitled to do so.  *Cf. In re Ridgemour Meyer Props., LLC*, Case No. 08-13153, 2018 WL 2305765, at *13 (Bankr. S.D.N.Y. May 18, 2018) ("In the Court's experience, it is not unreasonable or unusual for a 'second seat' to assist trial counsel and attend the trial particularly in complex commercial litigation involving numerous documents and witnesses."), *aff'd,* 599 B.R. 215 (S.D.N.Y. 2019), *aff'd*, 791 F. App'x 279 (2d Cir. 2020).  Nevertheless, 2.5 hours billed seems excessive for an arbitration that lasted only one hour.  Accordingly, the Court will disallow one hour of time, corresponding to $570.00 in fees, and award $5,985.00 for this aspect of the work opposing the Third Motion to Compel

### iii.    Opposition to Chaitman's Supplemental Letter

The Third Motion to Compel sought access to the BLMIS Database.  One day after the arbitration, Chaitman wrote a six-page letter to Judge Maas reiterating her position that the Trustee had hidden the fact that BLMIS used IA customer funds to buy securities, he refused to produce trading records because they did not support his case, she repeated some of the history in which the Trustee's counsel indicated a willingness to produce trading records and *expanded* the request to compel production of the 13,000 boxes of records in the Queens warehouse.  (*Chaitman Declaration*, Ex. AF.)

Her letter attached approximately 200 pages of exhibits, including another letter she wrote to me one year earlier and a 181-page index covering the microfilm.

Not surprisingly, the Trustee's counsel reacted. Shifrin reviewed Chaitman's post-arbitration letter and the arbitration transcript, conferred with Cremona and the "Good Faith Trial Team,"[21] and drafted a response (which was not included as an exhibit to the *Chaitman Declaration*). He billed 11.5 hours over two days aggregating $6,555.00. (*Shifrin Declaration*, Ex. C.) These services were directly connected to the Third Motion to Compel — the *Order* addressed and rejected the request for access to the warehouse boxes. The services were reasonable and necessary in light of Chaitman's post-arbitration letter, the amount of time was reasonable and the fees are awarded.

### c.    The Appeal

The Trustee initially attributed 68.8 hours of Shifrin's time, aggregating $40,179.20, to opposing the appeal from the *Order*, (*Shifrin Declaration*, Ex. E), but now agrees that the 1.8 hour-entry billed on March 26, 2019 involved a different matter. (*Reply* at 16 n. 8.) Accordingly, the Trustee is seeking an award of $39,128.00.

The preparation of the appeal required a substantial amount of time. The Defendants filed an appendix of exhibits with their appeal exceeding 300 pages, (*see Designation of Items to be Included in the Record*, dated Mar. 18, 2019 (ECF Adv. Pro. No. 10-04995 Doc. # 138)), and a fifteen-page brief. (*See Appellants' Brief.*) The Trustee countered with his own 591-page supplemental appendix, (*see Trustee's Supplemental Appendix*, filed Apr. 1, 2019 (ECF Adv. Pro. No. 10-04995 Doc. # 141)),

---

[21]    The "Good Faith" cases involve defendants who the Trustee concedes were unaware of Madoff's Ponzi scheme. Chaitman represents or represented a substantial number of Good Faith Defendants.

and a thirty-three-page brief.  (*See Trustee's Memorandum of Law in Opposition to Defendants' Appeal of Judge Maas' January 2, 2019 Order Denying Defendants' Motion to Compel*, dated Apr. 1, 2019 (ECF Adv. Pro. No. 10-04995 Doc. # 139).)

Nevertheless, the time records covering the appeal suffer from vagueness not found in the other time records.  First, Shifrin billed 9.7 hours aggregating $5,664.80 on 3/21, 3/22 and 3/23 describing the service as "[a]ddress opposition" to the appeal. Unlike a prior, similar time-entry, (*see Shifrin Declaration*, Ex. B (11/19/18 entry of 2.4 hours)), there was no further amplification.  "Address opposition" does not describe what Shifrin did or allow me to determine whether the amount of time he expended was reasonable.  This description suffers from the same type of vagueness as "attention to" a matter, a description of services that the Court has criticized in the past and penalized by reducing the corresponding award by 50%.  *See In re W. End Fin. Advisors, LLC*, No. 11-11152 (SMB), 2012 WL 2590613, at *12 (Bankr. S.D.N.Y. July 3, 2012); *In re CCT Commc'ns, Inc.*, No. 07-10210 (SMB), 2010 WL 3386947, *8 (Bankr. S.D.N.Y. Aug. 24, 2010). Accordingly, $2,832.40 is disallowed.

Second, the majority of the remaining entries include references to conferences with a Ms. Turner and, in some cases, a Mr. Villamayor, block-billed with other services. The Defendants objected to compensating the Trustee for "conferring internally for unknown reasons with unidentified personnel at Baker & Hostetler," including Turner and Villamayor.  (*Opposition* at 21.)  The Trustee did not respond to this objection or identify these individuals, and their names did not appear on the Trustee's appellate briefs.  For this reason, the award for the balance of the time charges in this category not

already addressed, $33,463.20, will be reduced across-the-board by 10% on account

these vague entries, and an additional $3,346.32 will be disallowed.

Accordingly, the Trustee incurred allowed fees in the sum of $32,949.28

opposing the appeal.  In summary, the following attorneys' fees are awarded (before any

further reduction) to the Trustee:

| Subject of Service | Fee Award |
|---|---|
| Joint Submission | 7,866.00 |
| Arbitration | 5,985.00 |
| Opposition to Chaitman's Supplemental Letter | 6,555.00 |
| Appeal | 32,949.28 |
| | **53,355.28** |

However, the award must be reduced by the 10% reduction that SIPC receives.  After

this reduction, the Trustee is awarded $48,019.75 in attorneys' fees.

### 2.    Expenses

The Trustee seeks an award of expenses in the sum of $9,327.15 representing

90% of Judge Maas's fee for his work in connection with the Third Motion to Compel.

(*Shifrin Declaration*, Ex. F.)  The only specific objection to the expense is that "it was

the Trustee who crafted the procedure through which discovery disputes would be

referred to Judge Maas, and it was the Trustee he [sic] told Defendants to submit this

dispute to Judge Maas." (*Opposition* at 23.)  The objection ignores two vital facts.  First,

the general order that appointed Judge Maas as the Discovery Arbitrator made

proceedings before Judge Maas purely voluntary.  (*Order Appointing a Discovery*

*Arbitrator Pursuant to Bankruptcy Rule 9019(c) and General Order M-390*, dated Oct. 4, 2016 (ECF Doc. # 14227).)  Second, the Defendants stipulated with the Trustee to submit their discovery dispute to Judge Maas.  (*Stipulated Order Appointing the Special Discovery Arbitrator*, dated Oct. 17, 2016 (ECF Adv. Pro. No. 10-04995 Doc. # 75).)  The Defendants could have insisted on proceeding before me but opted to proceed before Judge Maas.

Accordingly, the Trustee is awarded expenses in the sum of $9,327.15 which, together with the award of attorneys' fees, results in a total award of $57,346.90.

### 3.    Who Should Pay

As noted earlier, an award of attorneys' fees and expenses may be imposed against the client, the attorney who filed the motion, or both.  FED. R. CIV. P. 37(a)(5)(B); *accord Mugavero*, 680 F. Supp. 2d at 575.  "[W]hen the responsibility for an unjustifiable position taken with respect to a motion to compel rests solely with a party's attorney, courts may order that attorney to pay expense shifting sanctions."  MOORE'S § 37.23[4][a].  Here, the Defendants' unjustifiable position is attributable to Chaitman. She perpetuated the myth that the Trustee hid BLMIS's use of IA customer money to buy securities, when, in fact, this was fully disclosed in the Dubinsky Report, and then tried to leverage the Trustee's perceived dishonesty plus his greater resources to force the Trustee to review 30 million documents in the BLMIS Database and the contents of 13,000 boxes without regard to any notion of proportionality.

Accordingly, the Trustee is entitled to an award in the sum of $57,346.90 against Chaitman personally.  The Court has considered the remaining arguments not

specifically mentioned in this opinion and concludes that they lack merit.  Settle order

on notice.

Dated:  New York, New York
        March 20, 2020

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge